Terence Owen MATHEWS and Jeanne Elizabeth Mathews, Plaintiffs,

v.

ABC TELEVISION, INC., American Broadcasting Companies, Inc., Capital Cities/ABC, Inc., NDEFU Productions, Peter Beard, Peter Riva, Thomas S. Murphy, John Sias, Roone Arledge, John Hamlin and Gary Pudney, Defendants.

CAPITAL CITIES/ABC, INC., American Broadcasting Companies, Inc., and ABC Television, Inc., Third–Party Plaintiffs,

v.

ROBERT NIXON PRODUCTIONS, INC., Third–Party Defendant.

No. 88 Civ. 6031 (SWK).

United States District Court, S.D. New York.

Nov. 6, 1991.

Speiser, Krause, Madole & Nolan by Frank H. Granito, Jr., New York City, for plaintiffs.

Townley & Updike by Douglas C. Fairhurst, Christopher J. Nolan, New York City, for defendants.

Lester Schwab Katz & Dwyer by Richard Granofsky, New York City, for third-party defendant.

## MEMORANDUM OPINION AND ORDER

### KRAM, District Judge.

This diversity action arises from injuries that plaintiff sustained from a rhinoceros attack during the filming of an African wildlife documentary. Presently before the Court is defendants' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them partial summary judgment dismissing the complaint's fourth and fifth negligence claims.[1]

### BACKGROUND [2]

In 1987, Robert Nixon, on behalf of defendant ABC Television, Inc., invited plaintiff, Terence Mathews, a Kenyan sculptor and former professional big game hunter and safari guide, to make a filmed guest appearance on a wildlife special entitled "With Peter Beard in Africa: Last Word From Paradise" (hereinafter "Last Word From Paradise").[3] The film was produced by defendants NDEFU Productions, Peter Beard and Peter Riva, in conjunction with defendant Robert Nixon Productions, Inc. on behalf of defendants ABC Television, Inc., American Broadcasting Companies, Inc., Capital Cities/ABC, Inc., John Hamlin and Gary Pudney. The production was conceived as a dramatic photographic essay intended, in part, to depict the plight of wildlife in a changing Africa for a U.S. audience.

Prior to 1987, Mathews had had twenty years experience stalking big game and extensive familiarity with rhinoceros. In particular, Mathews knew that approaching a rhinoceros cow could be dangerous and that, in the unfortunate eventuality of a rhinoceros charge, one might be seriously injured or killed. During his career, Mathews had on several occasions appeared on-camera in connection with televised episodes of the *American Sportsman.* Mathews had also participated in these productions in an advisory capacity.

Mathews was asked to appear in "Last Word From Paradise" to illustrate "another facet of changing Africa—the transition of the big game hunter who once captured wildlife with his gun to the artist who now captures wildlife in sculpture." Affidavit of Peter Beard, sworn to February 1, 1989 ("Beard Aff."), at ¶ 4. Mathews' participation in "Last Word From Paradise," was as a guest and actor (albeit playing himself) who, as a recognized wildlife sculptor interested in the preservation of endangered species such as the rhinoceros, could dramatize the story line. *See* Deposition of Terence Mathews dated January 16, 1990 ("Mathews Tr."), at 41, 141, 233. Mathews received no compensation for his participation in the filming of "Last Word From Paradise."

On February 13, 1987, Mathews accompanied Beard, Nixon and a film crew to Kenya's Nairobi National Park, where the group intended to film Mathews and Beard tracking and photographing wild rhinoceros. Accompanying the group for security purposes was Duncan Ogutu, a park ranger armed with a rifle, and two other rangers.

1. The defendants specifically move for an order granting them summary judgment dismissing the complaint. Although the Court previously dismissed the complaint's first (invasion of privacy) and third (common law right of privacy) claims, it determined there to be a material issue of fact with respect to Mathews' second (proprietary right of publicity) claim. *See Mathews v. ABC Television,* No. 88 Civ. 6031, slip op. at 15, 1989 WL 107640 (S.D.N.Y. September 11, 1989). The Court therefore construes the motion as one for partial summary judgment dismissing only the previously unconsidered negligence claims.

2. For the purposes of this motion, the Court has construed the facts in the light most favorable to the plaintiff. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

3. The Court has viewed the relevant portions of the production, originally provided to the Court on VHS format videotape as Exhibit "1" to the affidavit of Peter Hill Beard, sworn to February 1, 1989 ("Beard Aff."). Accordingly, the tape shall be deemed part of the record for purposes of the Court's consideration of the instant motion but shall be returned to the custody of plaintiffs' attorneys in accordance with Local Civil Rule 24(c).

After locating a rhinoceros and her calf, Mathews and Beard stalked the animals while the camera crew filmed the scene from an appreciable distance. On this occasion, Mathews and Beard approached to within 35 to 45 yards of the rhinoceros without incident. During the filming, Mr. Ogutu was with the film crew in close proximity to Mathews and Beard.

The following day, the film crew returned to the Park to continue filming, and observed the mother rhinoceros and calf they had filmed the preceding day. Beard carried a hand-held 16mm movie camera with which he intended to film the rhinoceros. Mathews and Beard stalked the rhinoceros and, as they had done the preceding day, approached to a distance of about 40 yards. Both remained downwind of the animals, crouching low to the ground, in order to conceal their presence and avoid startling the animals. The film crew filmed the scene from a position some 150 yards behind Mathews and Beard.

As the two approached within 40 yards of the rhinos, a sightseeing bus arrived near the scene. Unbeknownst to Mathews or Beard, the armed park ranger had left his position to quiet the tour bus passengers.

After moving to within approximately 40 yards of the animals, Mathews stopped and crouched in the tall grass. Beard, however, stood and advanced toward the rhinos while filming with the hand-held camera. The rhinoceros cow, apparently having become aware of Beard's presence, turned and moved slowly toward him, paused momentarily, then charged. Beard retreated immediately, leading the animal's charge toward Mathews and the film crew. Mathews initially stood his ground, reflexively shouting "bugger off" in an attempt to impede the rhino's advance.[4] The rhino hesitated but was ultimately undeterred. As the rhino continued its charge, Mathews began to retreat but tripped and fell in the underbrush. The rhino cow continued its

charge toward Mathews, goring and seriously wounding him.

The complaint generally alleges that defendants were negligent in failing to provide reasonable safety measures against the eventuality of a rhinoceros charge. The complaint specifically alleges that defendants failed to (a) provide sufficient gamekeepers or other safety and security personnel, (b) secure the area from undue interference by tourists, and (c) provide sufficient rangers for the purpose of deterring a rush by an animal in the direction of the persons involved in the production. *See* Complaint at ¶ 25. With respect to Beard, the complaint alleges as follows:

BEARD, acting for himself and as agent for the aforesaid defendants ... in wanton disregard for the safety of others, including plaintiff, failed to heed the warning that he advance no closer to the rhinoceros and her calf, but instead continued to close the distance between him and the animals, doing so unreasonably in an upright posture and in a highly visible and conspicuous manner while filming with an inordinately noisy hand held camera that was unsuitable for the task, until he reached a position so dangerously close to the rhinoceros cow that she was thereby provoked to charge; and, further, defendant BEARD was negligent in that, having carelessly provoked the aforementioned charge, defendant BEARD panicked and fled in the direction of the plaintiff and the accompanying crew thereupon placing plaintiff in imminent danger by drawing the animal's charge towards plaintiff and the said camera crew.

Complaint at ¶ 25. The defendants now move, pursuant to Rule 56(c), for an order dismissing Mathews' negligence claims. They argue that Mathews should be deemed to have assumed the risk of injury in connection with approaching wild rhinoceros and, under Kenyan law, be precluded from recovery as a matter of law.

---

**4.** Mathews testified that he used the words "bugger off" because "it's got lots of 'grrr' in it, it sounds like a growl." Mathews Tr. at 114.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).[5] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

### B. *Volenti Non Fit Injuria*

Defendants contend that Mathews knowingly and voluntarily assumed the risks attendant to approaching a rhinoceros in the wild. They argue that by participating in the filming of the rhinoceros segment of "Last Word From Paradise," Mathews assumed the risk of being seriously injured or killed. According to defendants:

> the situation was delicate and [Mathews] knowingly and willingly put himself in that situation. This being so, plaintiff consented to the consequences—*no matter what brought them to fruition that day. . . .*

Memorandum in Support of Defendants' Motion for a Summary Judgment, at 29 (emphasis added). Defendants urge the Court to hold that under Kenyan law, Mathews' negligence claims are barred under the common law doctrine of *volenti non fit injuria* as a result of his admitted assumption of the risk of stalking a wild rhinoceros. The essence of defendants' contention is that once Mathews knowingly and voluntarily placed himself within a zone of danger, the Court must deem Mathews to have assumed the risk of all possible injury flowing from the dangerous situation. Defendants reason that because the possibility of attack was a risk Mathews assumed, and because what caused the rhinoceros to attack will never be known with certainty, the Court should preclude inquiry into defendants' conduct and hold that Mathews' assumption of the risk of a rhinoceros charge bars him from recovery.

Mathews opposes the motion and argues that in connection with his participation in "Last Word From Paradise," he assumed only those ordinary and reasonably foreseeable risks associated with stalking a rhinoc-

---

5. The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552–53. The movant does not have the burden of providing evidence to negate the opponent's claims. *Id.* As the Supreme Court noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

eros in the wild. While acknowledging assumption of those risks, Mathews contends that he may not be held to have assumed the risk of another's negligent or reckless conduct. Specifically, Mathews argues that he assumed neither the risk that defendant Beard would recklessly provoke a rhinoceros charge, nor the risk that, at a critical moment, inadequate safety precautions would fail to prevent his injury. The Court addresses these contentions below.

### 1. Vitality of *Volenti Non Fit Injuria* Under Kenyan Law

The parties do not dispute that Kenyan law applies to Mathews' tort claims but dispute the manner in which it applies. As a preliminary matter, the parties have properly raised the issue of Kenyan law in accordance with Rule 44.1 of the Federal Rules of Civil Procedure,[6] and, except as indicated, the Court has relied upon the relevant materials submitted by the parties in its consideration of the issues raised under Kenyan law.

Kenya adopted comparative negligence principles in 1956 when it enacted the Law Reform Act.[7] Unlike New York's comparative negligence statute which expressly abrogated assumption of risk as a complete bar to liability,[8] Kenya's statute makes no reference to assumption of risk. Cases subsequent to the Law Reform Act forced Kenyan courts to reconsider the assumption of risk defense, known in Kenya by the Latin, *volenti non fit injuria,* in light of comparative negligence principles.

In *Khimji v. Tanga Mombasa Transport Co. Ltd.,* [1962] E. Africa L.Rep. 419, the East African Court of Appeals had occasion to reconsider *volenti non fit injuria.* In *Khimji,* the plaintiff sought to recover for the wrongful death of a man who was alleged to have drowned when the bus in which he was riding overturned as it crossed a flooded river. Prior to the fatal crossing and after waiting fruitlessly for the flood waters to recede, the bus driver asked his passengers to disembark before attempting to traverse the river. The passengers refused to do so and after general encouragement from the passengers,[9] the driver attempted to cross. During the

---

**6.** Rule 44.1 provided as follows:

A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1.

**7.** The Law Reform Act provides in relevant part:
(1) Where any person suffers damage as a result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage

....

Chapter 26, Part IV, Laws of Kenya (1981).

**8.** New York's statute provides in relevant part:
In any action to recover damages for personal injury ... the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the

amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

N.Y.C.P.L.R. § 1411 (McKinney's 1974). Thus, except in cases of express contractual assumption of risk, New York law no longer requires plaintiff to prove himself or herself free from negligence contributing in the slightest degree to the occurrence as an element of his or her right to recover in a negligence action. *See Arbegast v. Board of Educ.,* 65 N.Y.2d 161, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985).

**9.** The Court of Appeals credited the driver's testimony as follows:

My passengers said 'Let us go. The first bus got across all alright. We can also go.' I told them, 'Let us wait a little until the water has gone down more'. They still said 'We can cross. Let us go'. Some passengers were down but got in and said 'Do not be afraid. We can cross alright'. All passengers said this.... I told them it was dangerous to cross with passengers on the bus and I had better go alone and they should remain there and I would wait at the other side until the water went down. As no one agreed and they pressed me, I started to cross.

*Khimji,* [1962] at 422.

crossing, the front wheel of the bus struck a submerged object which caused the steering wheel to turn the bus into deeper water where it came to rest, partially submerged. *Khimji*, [1962] at 422. As a result, the passengers were caused to evacuate the vehicle mid-stream, resulting in the drowning of one of the passengers.

The trial court determined, *inter alia*, that the defense of *volenti non fit injuria* was applicable to the case. The Court of Appeals agreed, holding as follows:

> In the instant case ... the passengers were not consenting to possible negligence on the part of the driver in executing the crossing of the flooded river; nor does the evidence suggest that the accident in mid-stream was caused by the negligent driving of the driver after he had undertaken the crossing. The act relied upon before us to support the plea of negligence was the risking of the crossing. This was a specific act. It was undertaken to overcome an unexpected hazard which had arisen in the course of the journey.... No doubt the duty of the driver as a common carrier was not to risk the safety of his passengers. But, if the passengers, fully appreciating the risk, nevertheless desired to incur it to avoid inconvenience to themselves, it appears implicit that, by requesting the driver to incur the risk, they would waive the carrier's duty in relation to the particular act and accept the ordinary risks attendant upon it. This is not to say that there was not still a duty on the driver to perform the crossing without negligence, but the consent to the undertaking of the crossing was a consent to incur the ordinary risks involved in the crossing. It was as a result of such an ordinary risk of the crossing

that the accident occurred. Accordingly, as I have said, I think the maxim could apply in this case if the facts necessary to support it are established.

*Id.* at 428. Based upon its finding that there had been no showing of negligence by the driver, the Court concluded that the plaintiff had no cause of action because the deceased had "freely and voluntarily, with full knowledge of the risk" of crossing the river, consented to the ordinary risks attendant to such a crossing. *Id.*

*Khimji* was decided in 1962, six years after Kenya adopted its comparative negligence statute. The case therefore indicates that the defense of *volenti non fit injuria* survives as a complete bar to a "plea" of negligence and that the Law Reform Act established comparative fault liability without eliminating the common law defense of *volenti non fit injuria*. *Accord* Affidavit of Salim Dhanji, sworn to January 30, 1991, at 4. Thus, in accordance with Kenyan law, this Court shall deem *volenti non fit injuria* a complete defense to negligence liability, available to defendants in this case.

### 2. Applicability

Resolution of this issue, however, does not dispose of the central issue raised by the parties' motions; namely, whether, under Kenyan law, the Court may not apply *volenti non fit injuria* to bar recovery where the evidence is sufficient to establish that the injury resulted from another's unforeseen reckless or negligent conduct? Put another way, under Kenyan law may a plaintiff be deemed to have assumed the risk of another's unforeseen reckless or negligent conduct?

In *Wooldridge v. Sumner*, [1963] 2 Q.B. 43, an English case [10] involving a spectator

---

10. Under Section 3 of the 1979 Judicature Act, Chapter 8 of the Laws of Kenya, Kenyan courts may look to the substance of the common law of England as well as English statutes of general application, when applicable, as persuasive authority. *Accord* Affidavit of Salim Dhanji, sworn to January 30, 1991, at ¶¶ 3, 7. Section 3 provides in relevant part as follows:

> The jurisdiction of the High Court, the Court of Appeal and of all subordinate courts shall be exercised in conformity with—

> (a) the Constitution;
> (b) subject thereto, all other written laws, including Acts of Parliament of the United Kingdom....
> (c) subject thereto and so far as those written laws do not extend or apply, the substance of the common law, the doctrines of equity and the statutes of general application in force in England on the 12th August 1897, and the procedure and practice observed in courts of justice in England at that date; but the

injured at an equestrian competition, the court discussed the application of *volenti non fit injuria* in a number of English cases involving spectators injured at various sporting events. In holding *volenti non fit injuria* inapplicable in that case, the court indicated in *dicta* that *volenti non fit injuria* would not apply to bar a spectator from recovery where his injury arose from a competitor's unforeseen reckless conduct even though the spectator had assumed the ordinary and foreseeable risks of attending the event:

> If the [performer's] conduct is ... reckless and in disregard of all safety of others so that it is a departure from the standards which might reasonably be expected in anyone pursuing the competition or game, then the performer might well be held liable for any injury his act caused. There would, I think, be a difference, for instance, in assessing blame which is actionable between an injury caused by a tennis ball hit or a racket accidentally thrown in the course of play into the spectators at Wimbledon and a ball hit or a racket thrown into the stands in temper or annoyance when play was not in progress.

*Wooldridge*, [1962] 2 Q.B. at 57. The court went on to reason that because of plaintiff's ignorance of horses he could not be found to have consented to the risks involved in observing the competition from the floor of the arena:

> the maxim in the absence of expressed contract has no application to negligence simpliciter where the duty of care is based solely upon proximity.... [T]he fact that the plaintiff owing to his ignorance of horses did not fully appreciate the nature and extent of the risk he ran did not impose upon [the rider] any higher duty of care towards him than that which he owed to any ordinary reasonable spectator....

*Id.* at 69–70. The court also observed that:

> The consent that is relevant is not consent to the risk of injury but consent to the lack of reasonable care that may

produce that risk, and requires on the part of the plaintiff at the time at which he gives his consent full knowledge of the nature and extent of the risk that he ran.

[1962] 2 Q.B. at 69.

Similarly, in *Khimji, supra*, the court emphasized that a knowing actor may assume the ordinary risks attendant to a specific endeavor but not be deemed to have discharged another from his obligation to exercise reasonable care in undertaking the endeavor:

> The act relied upon before us to support the plea of negligence was ... a specific act [the risk of which the plaintiff may be deemed to have assumed].... *This is not to say that there was not still a duty on the driver to perform the crossing without negligence....*

[1962] E. Africa L.Rep. at 428 (emphasis added).

Consideration of another scenario may be illustrative. A steel worker on a girder high above the pavement slips and falls to the pavement below, resulting in serious physical injury. An investigator finds upon the girder, in an area in which other workers had finished a coffee break, a banana peel. Although the injured worker may be found to have assumed the ordinary and foreseeable risks attendant to construction work high above the street, including that of serious injury resulting from an inadvertent fall from the girder, consistent with *Wooldridge* and *Khimji* the worker may not be found to have assumed the risk of slipping on garbage carelessly strewn about. This would be true even where the actual cause of the worker's fall could never be known with certainty. It would be sufficient that the trier of fact could find, by a preponderance of the credible evidence, that the peel was a contributing factor to the fall.

■ In view of applicable Kenyan law, the Court rejects defendants' contention that Mathews should be deemed to have

common law, doctrines of equity and statutes of general application shall apply so far only as the circumstances of Kenya and its inhab-

itants permit and subject to such qualifications as those circumstances may render necessary....

assumed *any* risk attendant to stalking the rhinos, and holds that Mathews may be deemed to have assumed and consented only to the ordinary and foreseeable risks of that activity; those risks would not, under Kenyan law, include the risk of injury stemming from Beard's unforeseeable reckless conduct or the producers' negligent conduct, if proven.

In urging a contrary result, defendants confuse assumption of the ordinary risk of stalking a rhinoceros with voluntary consent to another's reckless conduct. However, it does not follow that because Mathews acknowledged serious physical injury as an ordinary risk of his activity, he should be deemed to have assumed the risk of danger presented by Beard's alleged reckless conduct. In accordance with *Wooldridge*, the relevant inquiry is whether Mathews' consented to defendants' failure to use reasonable care rather than whether he consented to the risk of possible injury. Defendants' reasoning, as applied to *Khimji, supra,* would lead to an incongruous result; had the defendant there shown the plaintiff to have assumed the risk of injury as a possible risk of the crossing, the plaintiff would be barred from recovery notwithstanding evidence tending to establish the driver's negligence. Such a result would be directly contrary to the holding of *Khimji.*

Mathews shall not be precluded from offering, nor the Court from considering, evidence of defendants' negligent or reckless acts or omissions which may support the conclusion that such acts or omissions proximately caused plaintiffs' injuries, notwithstanding Mathews' assumption of the ordinary risks of the photographic safari. The Court shall thus consider the evidence before it to determine whether there are material issues of fact demanding resolution by a jury.

## C. *Scope of Mathews' Consent*

### 1. Assumption of Ordinary Risks

█ As a threshold matter, the Court finds no material issue concerning Mathews' knowing assumption of the ordinary risks attendant to stalking a rhinoceros in the wild. Mathews testified that he knew that approaching a wild rhinoceros was a risky undertaking. Mathews Tr. at 20, 74, 180, 291–92, 357–59. Mathews, moreover, admits that the ordinary risks of stalking a rhinoceros in the wild include the risk of serious injury or death, and that by participating in the filming of the rhinoceros sequences of "Last Word From Paradise," he knowingly assumed those risks.[11] Mathews also understood the danger of approaching the particular rhino that gored him. On the day preceding the incident, Mathews had concurred in Beard's description of this rhino as "windy," or unpredictable. Mathews Tr. at 146, 373; *see* Edited Highlights, annexed as Exhibit "C"

---

11. Mathews testified as follows:

    Q. In terms of approaching rhinoceri on safaris, would you consider yourself an expert?
    A. Yes.

    \*   \*   \*   \*   \*   \*

    Q. [A]n obvious risk when you are looking at rhinos, especially on foot, is that the rhino can charge at you, is that right?
    A. That's right.
    Q. And the risk of that could be that the rhino would gore you or kill you, is that right?
    A. That's right.
    Q. And when you went into the field for the film shoot on the 14th of February 1987, you understood those risks, is that right?
    A. Yes.
    Q. And isn't it also true that the risk of a rhino charging is enhanced if you are dealing with a mother rhino and her calf?
    A. Yes.

    Q. And you understood that risk as well when you went into the film shoot on the 14th of February when your accident happened, is that right?
    A. Yes.
    Q. Isn't it also true when you are photographing a rhino you have an enhanced risk if you are in an area where there isn't any cover? In other words, there aren't any trees to duck behind or any other natural barriers?
    A. Yes.
    Q. When you went into the field on the 14th of February, 1987 you understood that risk as well, isn't that true?
    A. Yes.

    \*   \*   \*   \*   \*   \*

    Q. Knowing the risk[s] you faced that day you nevertheless went forward with Peter Beard and approached the rhino, is that correct?
    A. Yes.
    Mathews Tr. at 290–94.

to affidavit of Douglas C. Fairhurst, sworn to December 3, 1990, at 3.

### 2. Assumption of Risk of Reckless Conduct

■ The complaint alleges that Beard behaved negligently and recklessly, thereby provoking the rhinoceros cow to charge. According to Mathews, Beard alerted the rhino to his presence by walking upright toward the rhino while filming with a noisy camera. Pl.Opp. at 24 (citing Mathews Dep. at 253). Although Beard denies that these facts indicate that his conduct caused the rhino to charge, the record contains sufficient evidence from which a reasonable jury could find in favor of Mathews on this issue.

Mathews testified that an experienced wildlife photographer would never intentionally alert a rhino to his presence because the animal is likely to "either run away, in which case you can't photograph it, or charge." [12] Mathews Tr. at 290–94. Mathews also testified that he was unaware of any plan to provoke the animals for sensational effect. *See* Mathews Tr. at 304, 306–16, 376–77, 380, 389.

The film's co-producer, Robert Nixon, testified that he understood safety to be a consideration in filming the rhinoceros. He explained that the objective of the filming was to

> go up within a safe distance of the rhino so we could get what's called an over-the-shoulder shot of Mathews and Beard talking about ... Terry's sculpture and

then the plight of the rhino. There was never any, at any point were we supposed to go closer than was safe

> . . . .

Deposition of Robert Nixon Productions, Inc. (by Robert Nixon) dated June 28, 1990 ("Nixon Tr."), at 381–82. Nixon also testified that, in connection with a prior film, "End Of The Game," he had told Beard "again and again, that it wasn't necessary ... to get so close to wildlife," yet "it seemed to go in one ear and out the other." Nixon Tr. at 122. Beard's reaction to this advice, according to Nixon, was to call Nixon and his camera crew "chicken" and "cowardly." *Id.* at 122, 124.[13]

Peter Leonard Poole, a film crew member present at the time of Mathews' injury, has testified that "Beard approached much too close to the Rhino's [sic], standing up and filming with an unblimped [14] noisy camera...." Affidavit of Peter Leonard Poole, sworn to July 2, 1991. According to Poole, this "clearly agitated the mother and provoked her charge in defence of her calf." *Id.* Nixon's testimony and Poole's sworn statement suggest that Beard may have approached the rhino in an unsafe manner thereby provoking her to charge.

Also significant is a portion of a document entitled "Shooting Script for an ABC Entertainment Special," which Mathews proffers as one of the preliminary shooting scripts for "Last Word From Paradise." *See* Exhibit "B" annexed to the affidavit of Terence Owen Mathews, sworn

---

**12.** The record is uncontradicted that both Mathews and Beard are experienced with African wildlife, have substantial familiarity with rhinoceros, and agree that experienced professionals may safely approach rhinoceros by staying downwind and by avoiding an upright posture or sudden movements. *See* Mathews Tr. at 291; Beard Tr. at 175.

**13.** Nixon also testified that on a prior occasion he had had a continuing argument with Beard over how closely Beard should approach the rhino:

Q. And I take it that there were conversations over a period of two days between you and Beard in which Beard expressed to you the belief that the footage that was obtained on the 13th wasn't good enough because they

hadn't gotten close enough to the rhinos, is that correct?
A. That's correct.
Q. And you had repeated to him more than once that the foreshortening that can be done through the motion picture lenses was sufficient for those purposes?
A. That's correct.
Q. But he disagreed?
A. We had continual disagreement about my knowledge of lenses versus his knowledge of lenses.
Nixon Tr. at 383.

**14.** A "blimped camera" is one that has been enclosed in a sound muffling device. *See Second Circuit Guidelines for Use of Cameras in the Courtroom*, N.Y. Law Journal, July 31, 1991, at 28, cols. 2–3.

to January 15, 1991 ("Mathews Aff."). Although the precise relation this script bears to the one actually used for "Last Word From Paradise" is uncertain, it contains a sequence in which an unnamed photographer "host" is nearly trampled by a charging rhinoceros:

> HOST photographs the mechanized might of an angry rhino unleashed. The rhino persistently bashes into the moving vehicles. Then it veers towards the HOST who shoots away with his camera as the confused animal comes charging.... But the HOST won't retreat. While the others in the party shout for him to get out of the way, he stands his ground. At the last minute he jumps out of the rhino's path, [sic] barely avoids being trampled by the juggernaut animal. Everyone breathes a sigh of relief.

Mathews Aff., Exhibit "B", at 5.

A letter from producer Peter Riva to John Hamlin of ABC Entertainment dated December 7, 1986, also is arguably probative of Beard's and (Riva's) intention to approach the rhinoceros more closely than might be considered reasonably safe:

> Certainly with Harry Minnitree [in Nairobi] obtaining permits and liasing [sic] with the various experts (making sure that our locations are the "hottest" and most "Beardesque"), we have started well. Bob Nixon has assembled his team of DP and second camera, using people that Beard has worked with before, *not afraid to "follow him in"*!

Mathews Aff., Exhibit "B" (Exhibit "3" of Deposition of Peter Riva dated March 3, 1990) (emphasis added).

The totality of this evidentiary material is probative of whether Beard may have approached the rhino more closely than was reasonably safe and whether he may have done so intentionally, for perceived sensational or photographic effect.

Most probative on the issue of Beard's reckless or negligent conduct, however, is the footage from the rhinoceros sequence of "Last Word From Paradise." This sequence shows the rhinoceros in the distance and Mathews and Beard crouching in the tall grass, slowly approaching the animals. The scene then shows Beard continuing to approach the cow which has turned to face him. Finally, Beard is shown filming the cow from an erect stance, pausing intermittently during the final few seconds before she charges. Probative of Mathews' claim that Beard and not some other factor provoked the charge is the manner in which the rhinoceros appears to change direction during the last few seconds before reaching Mathews. Although this segment of the footage, apparently shot from a considerable distance, does not show Beard retreating, it appears that the rhinoceros first charged and chased Beard and then changed direction when it detected Mathews. This footage, in connection with the evidence discussed above, raises a triable issue of fact concerning whether Beard's conduct recklessly provoked the rhinoceros to charge and whether Beard's conduct was the proximate cause of Mathews' injuries.

### 3. The Producers' Conduct

Plaintiffs' claims are based in part upon defendants' alleged failure to take proper safety precautions in connection with filming the rhinoceros sequence. With respect to this issue, and the issue of the aggravation of Mathews' injuries resulting from an allegedly delayed evacuation, the Court similarly denies defendants' and third-party defendant's motion for summary judgment. The uncontradicted if meager evidence tends to establish that the directors/producers bore substantial responsibility for the safety of those participating in the filming. Deposition of Peter Beard, dated April 5, 1990, at 87–88, 101–02. The uncontradicted evidence also indicates that the armed park ranger the producers relied upon for protection in the event of a rhinoceros charge had left his position at the critical moment. The Court holds that this evidence is sufficient to raise a triable issue of fact concerning the adequacy of the safety precautions employed by the producers, demanding determination by the trier of fact.

## CONCLUSION

For the reasons set forth above, defendants' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order dismissing the complaint's fourth and fifth claims is denied. Third-party defendant's motion for an order dismissing the supplemental complaint is similarly denied.

SO ORDERED.